Filed 9/30/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RON MODARAEI,<br><br>　　　Plaintiff and Appellant,<br><br>　　v.<br><br>ACTION PROPERTY<br>MANAGEMENT, INC.,<br><br>　　　Defendant and<br>　　　Respondent. | B290247<br><br>(Los Angeles County<br>Super. Ct. No. BC495179) |

　　　APPEAL from orders of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Affirmed.

　　　Parris Law Firm, R. Rex Parris, Kitty Szeto, John M. Bickford, and Ryan A. Crist; Lawyers for Justice, Edwin Aiwazian, and D. Elliot Gonzalez for Plaintiff and Appellant.

　　　Jackson Lewis, Scott C. Lacunza, and Kyle C. Worrell for Defendant and Respondent.

_____

Ron Modaraei appeals from an order denying a motion for class certification in an employee misclassification case he brought against his former employer, Action Property Management (APM). He also appeals from an order terminating depositions of class members who signed declarations that were filed as part of APM's evidence opposing class certification. Finding no abuse of discretion, we affirm the trial court's orders.

## BACKGROUND

APM provides property management services for common interest developments. The property (more specifically, the non-profit corporation that is the homeowners or other common interest association) contracts with APM to provide "staffing and resources to oversee the operations of the corporation. That generally means that there is some type of a manager assigned to that corporation, and that manager essentially functions as a CEO of the corporation and works with the board of directors to carry out those responsibilities."

The managers APM assigns to properties are "community managers," "portfolio managers," "general managers," and "on-site managers." While the term "community manager" could refer to any of the positions, the company uses "community manager" and "portfolio manager" interchangeably; likewise, the terms "general manager" and "on-site manager" are interchangeable.[1] As the parties do, we refer to the two

---

[1] APM's Chief Executive Officer, Matthew Holbrook, explained that "[p]eople in the industry will refer to anybody that is an association manager potentially as a community manager." APM calls managers whose assigned properties are managed from an APM corporate office "community managers" or "portfolio managers." "On-site managers" and "general managers" are

2

categories as community managers (CMs) and general managers (GMs).

APM hired Modaraei as a CM in its Rancho Cucamonga office in February 2007. Modaraei eventually became a GM at a high-rise building in West Hollywood, and later at a mid-rise building in downtown Los Angeles. Modaraei's employment was terminated in September 2010.

Modaraei filed this proposed class action against APM on November 2, 2012, alleging 10 causes of action stemming from APM's alleged misclassification of CMs and GMs as exempt employees rather than non-exempt employees under Industrial Welfare Commission wage order No. 5-2001. (Cal. Code Regs., tit. 8, § 11050.)[2] On October 10, 2014, Modaraei moved the trial court for an order certifying two subclasses of APM employees and former employees. The first proposed subclass was "[a]ll current and former salaried [CMs] employed by [APM] within the State of California at any time during the period from November 2, 2008 until the present." (Fn. omitted.) The second proposed subclass was "On-site Managers/General Managers."

---

those whose offices are located at the assigned property. CMs typically (but not always) manage multiple properties at the same time. GMs manage a single property.

[2] Modaraei's complaint alleged causes of action for unpaid overtime, unpaid meal period premiums, unpaid rest period premiums, unpaid minimum wages, final wages not timely paid, wages not timely paid during employment, non-compliant wage statements, failure to keep requisite payroll records, unreimbursed business expenses, and violations of Business and Professions Code section 17200.

APM filed its opposition to Modaraei's motion for class certification on September 1, 2017.[3] Along with its opposition, it served declarations of more than 30 putative class members. At Modaraei's request, the trial court continued the class certification hearing and ordered each of APM's putative class member declarants to appear for deposition. The depositions were not to exceed 2.5 hours each. The trial court also ordered that "the subject matter scope of each deposition is limited to the facts and circumstances related to the preparation, generation and obtaining of the Declaration and the facts and information contained in the Declaration."

On October 26, 2017, APM filed an ex parte application for a protective order terminating further depositions of its putative class member declarants. The next day, the trial court entered an order granting APM's ex parte application.

Modaraei filed his reply in support of class certification on November 17, 2017. The trial court heard and denied Modaraei's motion for class certification on May 11, 2018.[4]

In its order, the trial court stated that Modaraei had "not shown predominance of common questions and superiority/manageability." The trial court compared and contrasted evidence Modaraei presented with evidence APM

---

[3] The record does not account for the delay between Modaraei's October 2014 motion for class certification and APM's September 2017 opposition.

[4] In December 2017, APM filed a motion to deny class certification to be heard concurrently with Modaraei's motion. The trial court denied APM's motion as moot "[i]n light of the concurrent ruling denying [Modaraei's] motion for class certification . . . ."

4

presented and credited APM's evidence over Modaraei's to conclude that "the trier of fact would have to make individualized inquiries on a property-by-property basis and manager-by-manager basis to determine how CMs and GMs actually spent their time." According to the trial court, individual questions would predominate. The trial court also concluded that Modaraei's trial plan was inadequate because it failed to account for variations in tasks performed and the time CMs and GMs spent on those tasks (identified in the trial court's predominance analysis) and because Modaraei's expert witness's "promise to conduct a statistical analysis in the future is not a trial plan."[5]

Modaraei filed a timely notice of appeal.[6]

---

[5] Along with its order denying class certification, the trial court made a number of evidentiary rulings based on objections filed by both parties. Neither party has appealed the trial court's evidentiary rulings. "As a result, any issues concerning the correctness of the trial court's evidentiary rulings have been waived. [Citations.] We therefore consider all such evidence to have been properly excluded." (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014-1015.) We have not incorporated excluded evidence in the background or considered it in our review of the trial court's order denying class certification.

[6] The appellant's appendix is both technically and substantively deficient. "The California Rules of Court require an appellant who elects to proceed by appendix to include, among other things, any document filed in the trial court which 'is necessary for proper consideration of the issues, including . . . any item that the appellant should reasonably assume the respondent will rely on.' " (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 643 (*Jade Fashion*); Cal. Rules of Court, rule 8.124(b).) "Where the appellant fails to provide an adequate record of the challenged proceedings, we must presume

## DISCUSSION

Modaraei challenges the trial court's order denying his motion for class certification. Modaraei also appeals from the trial court's October 27, 2017 order terminating the depositions of APM's putative class member declarants.

## I. Denial of Class Certification

### Standard of Review

" 'We review the trial court's ruling [denying class certification] for abuse of discretion and generally will not disturb it, " 'unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' " ' [Citation.] If the court's 'reasons for granting or denying certification . . . are erroneous, we must reverse, whether or not other reasons [could have been] relied upon [to] support[]

_____

that the appealed judgment or order is correct, and on that basis, affirm." (*Jade Fashion*, at p. 644.)

This recitation is not exhaustive by any measure, but the deficiencies in the appellant's appendix include missing required documents, such as the register of actions (Cal. Rules of Court, rules 8.124(b)(1)(A) and 8.122(b)(1)(F)), and missing documents that Modaraei should have reasonably assumed APM would rely on (Cal. Rules of Court, rule 8.124(b)(1)(B)), such as APM's memorandum of points and authorities it filed in opposition to Modaraei's motion for class certification and the objections APM filed (and the trial court ruled on) to Modaraei's class certification evidence. Some documents *included* in the appellant's appendix were *incomplete*, such as a declaration of APM's counsel attaching certain deposition testimony and other exhibits, and APM's compendia of evidence filed to support its opposition to class certification. (See Cal. Rules of Court, rule 8.124(g).)

But because APM filed a respondent's appendix that included a record sufficient for us to review the trial court's order, we do so. (See *Jade Fashion, supra*, 229 Cal.App.4th at p. 644.)

6

the ruling.' [Citations.] In this respect, ' "appellate review of orders denying class certification differs from ordinary appellate review. Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling." ' " (*McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 450 (*McCleery*); see *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 25 (*Duran*).) "Because trial courts ' "are ideally situated to evaluate the efficiencies and practicalities of permitting group action," ' they are ' "afforded great discretion" ' in evaluating the relevant factors and ruling on a class certification motion." (*McCleery*, at p. 450.)

## Class Certification

"[W]hen the question is one of common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." (Code Civ. Proc., § 382.) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021; *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 968.) "The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately

7

represent the class.' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.)

Here, the inquiries at issue are predominance and superiority.

## Predominance of Common Questions

### 1. Improper Criteria

Modaraei contends that the trial court abused its discretion by basing its predominance analysis on improper criteria. Modaraei argues that he based his theory of recovery on a "common core of non-exempt tasks," and that the trial court improperly "bas[ed] its denial in variations that would have no effect on the core tasks."

Modaraei's argument is based on our opinion in *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286 (*Jaimez*). In *Jaimez*, we concluded that the "[p]laintiff's 'theory of recovery' involve[d] uniform policies applicable to [a group of employees] that" were amenable to class treatment. (*Id.* at p. 1299.) That the defendant might have "identif[ied] individual effects of policies and practices that may well call for individual damages determinations . . ." did not affect the amenability of the plaintiff's theory of recovery to class treatment. (*Id.* at p. 1300.) "In *Jaimez*, the court explained that what the trial court must do is examine all the evidence together in light of the plaintiffs' theory of recovery. If the plaintiffs choose to pursue their case on a theory that the defendants' policies and procedures adversely affected the class as a whole, regardless that some class members may not have been harmed, then the evidence presented must be evaluated on that basis." (*Department of Fish & Game v. Superior Court* (2011) 197 Cal.App.4th 1323, 1349.)

Modaraei contends that his theory of recovery is similar to the theory of recovery in *Jaimez* because GMs and CMs have the same "duties." Modaraei also repeatedly turns to *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 330-331 (*Sav-On*) to persuade, as it tried to persuade the trial court, that there is a "reasonably definite and finite list" of tasks that GMs and CMs perform, and that all the trial court must do is determine whether each of those tasks is exempt or non-exempt. In *Sav-On*, however, "the tasks discussed in both defendant's and plaintiffs' submissions comprise[d] a reasonably definite and finite list." (*Ibid.*) The same was true in *Jaimez*; the list of tasks class members performed was undisputed, and was a reasonably definite and finite list of tasks. (See *Jaimez*, *supra*, 181 Cal.App.4th at p. 1302.) That is not the case here; the parties disagree about the tasks GMs and CMs perform. The trial court noted that distinction in its order, and we agree with the trial court's ultimate assessment that "[u]nlike in *Sav-on*, where the predominant issue was task classification, the predominant issue here is how CMs and GMs actually spent their time." (See *Duran*, *supra*, 59 Cal.4th at p. 26; also (Cal. Code Regs., tit. 8, § 11050(1)(B)(1)(e) ["[t]he work actually performed by the employee during the course of the workweek must, first and foremost, be examined"].) Modaraei's theory of recovery, then, depends on Modaraei first establishing the "reasonably definite and finite list of tasks" APM's GMs and CMs perform. Modaraei's burden on class certification is not to do so, but to produce evidence that he *can* do so at trial. The trial court was not convinced he could.

The trial court's order lays out in detail the differences between the parties' evidence: "On the one hand, although

9

[Modaraei's] declarants acknowledge differences in the properties they managed, they state that 'the responsibilities and tasks [they] performed were the same' and that '[t]here was no relationship between the differences between the properties and the tasks and duties [they] performed on a daily, weekly or monthly basis.' [Citations.]

"On the other hand, [APM] presents evidence that there are a multitude of factors affecting the complexity of a property and its manager's tasks. [Citation.]

"Matthew Davidson . . . , [Modaraei's] former supervisor, testified that a property may be more complex than another based on "[t]he type of issues that it's facing, the size of the building, the infrastructure, the size of the staff, the level of amenities, the expectation of the residents.' [Citation.] As an example, he stated that 'an older building might have a lot of infrastructural repairs that are needed that require somebody with some experience in managing large capital improvement projects,' while 'a brand new building that was actually well built may not require a lot of repairs, and so you can have a manager who doesn't have much experience on cap-ex but is a really good people person who could make the residents feel good about their living environment.' [Citation.] In explaining how amenities affect a property's complexity, he stated: 'Well, buildings have different types of amenities, and the more stuff you have, the more maintenance it takes and the more stuff goes wrong with it. So you're probably going to need a bigger staff and a larger budget if you have to maintain a building that has a theater room, a billiards room, a library, a conference room, a fitness facility, an indoor pool, an outdoor pool, and seven levels of gated parking than if you manage a building where everybody drives

into their own private garage and there's one walkway in between the units.' [Citation.] As for the impact of building size, he stated: 'The buildings that we manage come in all different shapes and sizes. We have one, I think it's a nine-story building in Santa Monica that has about 30 units and we have a building in San Francisco that consists of four high-rise towers and 650 units.' [Citation.] He continued: 'Well, the bigger the building, the more people it takes to run it, the larger the budget, and the more residents you have all with their own opinions about how they want their home to be managed and to look.'

"[APM's] Person Most Knowledgeable, Matthew Holbrook . . . echoed Davidson's testimony,[7] but identified even more factors affecting the tasks performed by CMs and GMs, such as:

- Demographics ('We actually have communities that would be age-restricted communities, and then you have a whole variety of ranges of types of demographics in each community, and then there are subsegments within each community where there can be differences from one part of the community to another.'[8])

---

[7] "When asked what factors go into the complexity of a property, [Holbrook] responded: 'The staffing requirements, the services that are expected to be provided. The number of units plays into that. The overall volume of the amenities, the particular projects that may be in place at any given time, the overall staffing requirements. I don't know if I mentioned the size of the budget. Anything that would add to the overall dynamics of the workload.' [Citation.]"

[8] "[Citation.] 'If a community is age-restricted, then there's responsibilities that a manager has to require and oversee the

11

- Composition of Boards of Directors ('Probably the primary difference just being in the individual boards of directors can differ.  So just even personality differences within a board of directors has a significant impact on the overall nature of what it takes to manage the community.')
- Governing rules ('Yes, the bylaws, the CC&Rs, the articles of incorporation, the architectural guidelines, the rules and regulations.  There are different municipality codes restrictions, etcetera, that are going to impact different communities in different ways based on where they're geographically located.')
- Type of property ('A community manager is going to be responsible for overseeing the maintenance responsibilities of the roofing of the condo most of the time.  Whereas in a single-family home community, they woud not be responsible for the roofing of the homes.'[9])
- Property location (e.g., urban versus suburban areas) ('I can give you an example.  So a high-rise community in downtown Los Angeles would be – the manager of a community would have responsibility to be overseeing

---

process of new owners completing the proper documentation regarding the age restriction in the community.'  [Citation.]"

[9] "[Citation.]  In addition, a CM for a condominium is responsible for '[e]xterior painting of the individual units' and '[p]otentially the front yard landscape maintenance, the exterior lighting of a particular unit, potentially some window repairs, replacements; HVAC maintenance and repairs, replacement; boiler repair, replacement; rear yard fencing maintenance, repair, replacement; anything exterior to the unit or a part of the structural components of the units.'  [Citation.]"

added – an additional security and patrol service on the evening that the Los Angeles Kings won the Stanley Cup if their building was located close to Staples Center, where that event took place, in the event that there might be any crowd issues that might result from that dynamic. That's unlikely to happen in a suburban area.')

- Whether the property includes commercial units ('Often in the urban communities, there will be some commercial component where there are commercial condominiums, and so the manager would have the responsibility of interfacing with the owners of the commercial units in the individual businesses, which raises a whole different list of issues that can arise.')

- Whether the property is on a slope ('The existence or nonexistence of slopes will drive a significant difference in what a manager's duties are going to be.')

" . . . Here, the Court credits [APM's] evidence (that there is a wide variation in tasks performed by CMs and GMs due to the differences in properties and the ensuing time demands on managers) over [Modaraei's] cookie-cutter evidence (that tasks performed by CMs and GMs are exactly the same regardless of the property)." (Fns. omitted.)

As we explained in *Jaimez*, "the California Supreme Court has set forth the 'proper legal criterion' for determining whether a class should be certified as 'whether . . . plaintiffs . . . established "by a preponderance of the evidence that the class action proceeding is superior to alternate means for a fair and efficient adjudication of the litigation." ' " (*Jaimez, supra*, 181 Cal.App.4th at p. 1299, quoting *Sav-On, supra*, 34 Cal.4th at p. 332.) "A trial court ruling on a certification motion determines

13

'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Sav-On*, at p. 326.)

The trial court here evaluated the evidence in the context of Modaraei's theory of recovery, but it included the step that Modaraei omitted. At the hearing on Modaraei's motion, the trial court repeatedly highlighted and asked for clarification of Modaraei's omission. Modaraei took several different runs at establishing that the trial court could eventually discern a limited set of tasks to then be classified. The trial court credited APM's contradictory evidence over evidence Modaraei collected, that the "core tasks" of both jobs are: "(1) collecting and processing dues; (2) processing service requests; (3) performing light service requests; (4) walking around the property to observe and record damage or disrepair; (5) providing customer service for the HOAs; and (6) performing other secretarial work for the HOAs."

At the hearing, Modaraei's argument focused almost entirely on CM and GM job descriptions that included lists of "duties" that Modaraei called "tasks." Some of those duties were "[i]mplement Board policy and directives within the scope of the management contract," "[s]upervise all on-site personnel," "[e]nsure compliance with all applicable Civil Codes and Corporations Codes," "[m]eet[] contractual obligations for each community," and "[g]uide, mentor and assist the respective board of directors[] to make sound, prudent and lawful business

14

decisions."[10]  The trial court expressly highlighted Modaraei's conflation of "duties" with "tasks":  "I guess where I'm trying to direct an understanding out is how this list of duties and responsibilities turns into tasks.  [¶]  Because they are so broadly articulated and broadly defined that, while my collection of duties may define my job position, it certainly doesn't translate into enumerated tasks that all a jury then would have to do is decide whether or not they're exempt or nonexempt; and then whether or not the class spent more than half of their time performing them."

Modaraei also argued that a variety of standardized policies and procedures, like APM's "Policy for Approval Authority & Signing of Contracts," the requirement that CMs and GMs complete the "Certified Community Association Manager" program, APM's "Vendor Selection Policy," and APM's "Guide to Community Management" standardized the positions to the point that GMs and CMs could exercise no discretion.  The trial court determined that even with standardized policies, liability for each class member would turn on how individuals actually spent their time.

That the trial court weighed evidence and credited one party's evidence over conflicting evidence from another party does not constitute an "improper criteria" or "incorrect legal analysis." (*Sav-On*, *supra*, 34 Cal.4th at p. 331 ["the trial court was within its discretion to credit plaintiffs' evidence on these points over defendant's, and we have no authority to substitute our own judgment for the trial court's respecting this or any other conflict in the evidence"].)  " 'Critically, if the parties' evidence is

_____

[10] The GM job description included 33 bullet points under the "duties" heading; the CM job description included 28.

conflicting on the issue of whether common or individual questions predominate (as it often is . . .), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met.' " (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 981 (*Mies*); *Duran*, *supra*, 59 Cal.4th at p. 25.)

### 2. Substantial Evidence

Because we have concluded the trial court's ruling does not rest on improper criteria or erroneous legal assumptions, we confine the remainder of our review to whether substantial evidence supports the trial court's ruling. "As the Supreme Court has noted, this deferential aspect of the standard of review means that when an employee has sought to certify a 'misclassification' class of fellow employees with the same job title, the Courts of Appeal have 'routinely upheld' trial court orders denying certification, while also upholding other trial court orders granting certification." (*Mies*, *supra*, 234 Cal.App.4th at p. 981.)

The evidence APM relied on to oppose Modaraei's motion is sufficient to support the trial court's ruling. APM produced declarations from more than 30 putative class members describing the variations in the properties and employees they managed.

One GM was responsible for a 2,200 single-family residence community with two pools and two recreational centers. Another was responsible for a 43-story high-rise in San Diego with 248 units and amenities including a conservatory, a gym, sauna, steam room, and a park. One CM was responsible for an association that would eventually have 318 homes, but 43 had not yet been built, and another that had 30 homes and would eventually have 132 total single-family homes. That CM noted

16

that "[e]ach property is unique and requires different amounts of time for management and oversight," and cited one of the properties that has two recreational areas, lawn areas, and four entrance gates. Another was responsible for four mid-rise condos and one townhome condo in the Los Angeles area. Two of the properties were similar and had similar projects like garage cleaning and hydrojetting, which the CM stated required more attention than the townhome property. "[T]he hours I work at each property are constantly changing depending on different circumstances affecting each community and what each contract states," she said.

The record reflects properties varying in size from a single building with 28 units to a property with 2,892 single-family residences. Property types ranged from simple condominiums to a community of 41 single-family estates. Individual home values across properties ranging from $200,000 to $30,000,000. Amenities varied from properties with few amenities to a property with a club house, swimming pool, tennis courts, bocce ball courts, fitness center, learning center, ballroom, café, spa, conference rooms, and a golf course. Some managers supervised no other employees, while one supervised as many as 80. And while some managers (primarily GMs) managed only one property, the record contains declarations from two CMs who were each responsible for nine separate properties. The record contains evidence sufficient to support the trial court's determination that variations between the hundreds of properties the 228 putative class members were responsible for would command individual inquiries into how CMs and GMs actually spend their time to reach individual liability determinations.

We note, as the Supreme Court did in *Sav-On*, that this case turns primarily on the standard of review. In *Sav-On*, the Court wrote: "We need not conclude that plaintiffs' evidence is compelling, or even that the trial court would have abused its discretion if it had credited defendant's evidence instead. '[I]t is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' " (*Sav-On, supra*, 34 Cal.4th at p. 331.)

**Superiority**

The trial court determined that Modaraei's "proposed trial plan is inadequate" because it did not address APM's "defense that there are variations in the tasks performed and the time spent on those tasks by CMs and GMs." The trial court also rejected Modaraei's expert witness's proposal to conduct statistical analysis *after* class certification to reach a conclusion about tasks class members performed and how much time they spent performing those tasks. "[A] promise to conduct a statistical analysis in the future is not a trial plan," the trial court said.

We agree with the trial court's analysis. The evidence to support the trial court's superiority determination is largely the same as evidence supporting the predominance determination; because any trial about APM's liability to its CMs and GMs would break down into individual trials for each GM and CM, we find no abuse of discretion.

## II.   Termination of Depositions of APM Declarants

We review trial court discovery orders for abuse of discretion. (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 540.)

18

Modaraei contends that the trial court abused its discretion when it terminated depositions of putative class members whose declarations APM submitted in opposition to Modaraei's motion for class certification. Modaraei argues that "the remaining deposition testimony was critical to the issues before the court" because "[a]dditional testimony as to what the declarants did and the lack of variation between properties would have allowed [Modaraei] to address the court's concerns about commonality."

The trial court did not abuse its discretion. As APM has pointed out and as the trial court explained at length during the class certification hearing, Modaraei had more than ample opportunity to obtain discovery from putative class members, including their depositions, between the time the case was filed in November 2012 (or even the time the motion for class certification was filed in October 2014) and the time APM filed its opposition to class certification in September 2017.

Modaraei *filed* declarations of putative class members in support of his motion for class certification. Eight of those declarations constituted a "Compendium of Putative Class Member Declarations in Support of Plaintiff Ron Modaraei's Class Certification." Modaraei also submitted deposition testimony from *nine more* putative class members in support of his motion. Modaraei possessed names and contact information for every class member for at least two years before the hearing on his motion for class certification. He had every opportunity to get the discovery he needed to support his motion for class certification.

Additionally, based on his arguments here, none of the information he could have obtained by deposing every single putative class member (even outside APM's declarants) would

19

have changed the outcome. Modaraei contends that the trial court used improper criteria to arrive at a ruling on the motion for class certification. The criteria Modaraei contends the trial court *should* have used has nothing to do with variations in properties that APM presented. There is nothing in either the record or the parties' briefs, therefore, to suggest that deposing even every single class member (as Modaraei theoretically had both the time and access to do) would have changed the argument Modaraei made to the trial court. Neither is there anything in the record or in the parties' briefs to suggest that the trial court would have reached some different conclusion on class certification had it been able to see more of the same type of evidence Modaraei had already presented. The trial court noted as much at the class certification hearing: "[T]hose depositions don't change the gravamen of your argument. The gravamen of your argument is that the PMK said, 'this is a complete description of the duties and responsibilities of the putative class members. [¶] 'With those duties and responsibilities, I have sufficient predominant common proof, and I can go through this list of duties and responsibilities, assign them to either exempt or nonexempt classifications, and compute whether or not it exceeds 50 percent.' [¶] That's your argument. So it doesn't make a whole heck of a lot of difference about the declarations because your argument doesn't rely on them. It doesn't."

Moreover, Modaraei does not challenge the scope of the trial court's discovery orders (that he violated), but rather he challenges the trial court's decision to *enforce* the discovery orders it made by not allowing further violations. The trial court allowed Modaraei depositions of APM's putative class member declarants "for the limited purpose of asking about the way in

20

which the declarations were prepared, the witnesses' participation in the preparation of that declaration, and to examine the question of whether or not the similarity of the declarations supported some kind of contention that they had been invented by the lawyers or otherwise weren't their genuine recollection or recall . . . . [¶] Despite the fact that the discovery was limited solely to the preparation of the declaration, questions were asked by plaintiff's counsel that went far outside of that order. [¶] I got an emergency request for a further status conference. It was conducted, and I declined to allow the discovery to go forward because it didn't appear that the stated reason for needing the discovery was, in fact, the reason that – it didn't comport with the questions being asked."

On this record, we find no abuse of discretion. And given the record and Modaraei's arguments here, we could not conclude that any error would have been prejudicial. (See *MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045.)

### DISPOSITION

The trial court's orders are affirmed. APM is entitled to its costs on appeal.

CERTIFIED FOR PUBLICATION


CHANEY, J.

We concur:


ROTHSCHILD, P. J.          WEINGART, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21